
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| ROGER WALKER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil Action No. 5:16-cv-448-CLS |
| ) | |
| AUTO-OWNERS INSURANCE ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Roger Walker, asserts causes of action against defendant, Auto-Owners Insurance Company ("Auto-Owners"), for breach of contract and bad faith, both related to Auto-Owners' denial of a commercial property insurance claim.[1] The case currently is before the court on defendant's motion for partial summary judgment

---

[1] *See* doc. no. 1-1, at ECF 3-4 (Complaint). "**ECF**" is an acronym formed from the initial letters of the name of a filing system that allows parties to file and serve documents electronically (*i.e.*, "Electronic Case Filing"). Bluebook Rule 7.1.4 allows citation to page numbers generated by the ECF header. *The Bluebook: A Uniform System of Citation*, at 21 (Columbia Law Review Ass'n *et al*. eds., 19th ed. 2010). Even so, the Bluebook recommends against citation to ECF pagination in lieu of original pagination. Consequently, unless stated otherwise, this court will cite to the original pagination in the parties' pleadings. When the court cites to pagination generated by the ECF header, it will, as here, precede the page number(s) with the letters "ECF."
  The complaint originally was filed in the Circuit Court of Madison County, Alabama, on March 7, 2016. Defendant removed the case to this court on March 17, 2016, asserting federal jurisdiction based on satisfaction of the requirements of the diversity statute, 28 U.S.C. § 1332(a). *See* doc. no. 1 (Notice of Removal). Plaintiff is an Alabama resident, and defendant is a Michigan corporation with its principal place of business in Michigan. *Id.* ¶ 4. Additionally, the coverage amounts at issue exceed the jurisdictional minimum. *Id.*

with regard to plaintiff's bad faith claim.² Upon consideration of the motion, briefs, and evidentiary submissions, the court concludes the motion should be granted.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is 'only a guess or a possibility,' for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover,

---

² Doc. no. 16.

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. SUMMARY OF FACTS

Plaintiff, Roger Walker, owns commercial property located at 1003 Putnam Drive in Huntsville, Alabama, described more particularly as location 3, building 1 ("the property").[3] The roof of the property, which was constructed from a rubber material called "EPDM,"[4] was installed in approximately 1996.[5] The roof

---

[3] Doc. no. 1-1, at ECF 3 (Complaint), ¶ 1. Plaintiff's complaint, of course, is not evidence. Even so, defendant included plaintiff's ownership of the property as a proposed fact in its brief, and plaintiff did not dispute that fact. *See* doc. no. 16-1 (Defendant's Brief), at 1 (Proposed Fact No. 1); doc. no. 18 (Plaintiff's Brief), at 1 ("Plaintiff agrees that the Defendant's Statement, as far as each individual statement goes, is correct."). Therefore, this fact will be taken as true for summary judgment purposes. *See* doc. no. 8 (Uniform Initial Order), at ECF 15 ("*All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*") (emphasis in original); *id*. at ECF 16 ("*All additional material facts set forth in the statement required of the opposing parties will be deemed to be admitted for summary judgment purposes unless controverted by the statement of the movant.*") (emphasis in original).

[4] "EPDM" is an acronym that stands for Ethylene Propylene Diene Monomer. *See* doc. no.

experienced a few small leaks beginning in approximately 2012. Plaintiff purchased a kit to repair some of the roof seams in 2012 or 2013, and he hired a roofing company to make other repairs during that same time frame.[6] The roof experienced another small leak in 2014, so plaintiff called Atlas Roofing to assist with the repairs. Because "the roof was older and out of warranty," he asked Atlas to provide him with two quotes: one for repairing the seams, and another for replacing the entire roof.[7]

Defendant, Auto-Owners Insurance Company ("Auto-Owners"), issued Policy No. 894617-38467926-13 ("the policy") to plaintiff, for the purpose of providing commercial property and commercial general liability coverage for the property from November 3, 2013 to November 3, 2014.[8] The policy provided coverage for physical damage to the property, unless one of the listed exclusions or limitations applied.[9] One of the listed exclusions was:

> 2. We will not pay for loss or damage caused by or resulting from any of the following:
>
>    . . . .

---

16-6 (Donan Engineering Report), at ECF 3 ("[T]he roof is clad with an ethylene propylene diene monomer (EPDM) roof.") (alteration supplied).

[5] Doc. no. 16-4 (Deposition of Roger Walker), at 15.

[6] *Id.* at 17-21.

[7] *Id.* at 22.

[8] Doc. no. 16-7 (Policy), at ECF 2, 4-5.

[9] *Id.* at ECF 31.

> d. (1) Wear and tear;
>
> (2) Rust, corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;
>
> . . . .
>
> (4) Settling, cracking, shrinking or expansion[.]

Doc. no. 16-7 (Policy), at ECF 32-33 (ellipses and alteration supplied). One of the listed limitations was:

> 1. We will not pay for loss of or damage to:
>
> . . . .
>
> c. The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:
>
> (1) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or
>
> (2) The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

*Id.* at ECF 35.

Walker reported to Auto-Owners on March 17, 2014, that the property had

recently been damaged by wind and water during a storm.[10] Auto-Owners assigned Sam Evers, an independent adjuster with Evers & Associates, Inc., to investigate the claim. Evers submitted a report, along with photographs of the interior and exterior damage, to Auto-Owners on March 24, 2014. His report stated the following with regard to the Cause of Loss:

> The insured reported that wind caused damage to his roof cover during a storm on March 16, 2014. The insured further advised that this damage allowed water to enter the building and cause damage to the interior.
>
> During my initial conversation with the insured, I was advised that he had hired Atlas Builders & Roofing, a local contractor, to repair two small leaks on the roof. The insured advised that these leaks were present in the front and rear corner of the building. The insured advised that he left town around March 16th, and found severe water damage to the interior of the building when he returned.
>
> I have contacted the insured's roofer, Bill Willis, and discussed the time line of events.
>
> According to Mr. Willis, he arrived at the insured's building on February 24th to address two potential water leaks on the front corner and rear corner of the building. At that time, the roofer had measured the roof and was going to provide an estimate to "recover" the roof. Mr. Willis further advises that he returned to the insured's building on March 18th [*i.e.,* after the storm] to make repairs and found that the roofing seam had been "pulled apart" and that the rubber roofing had been pulled away from the parapet wall.

Doc. no. 16-3 (Evers & Associates, Inc. Report), at ECF 2 (alteration supplied).

---

[10] Doc. no. 1-1, at ECF 3 (Complaint), ¶ 2.

Evers also inspected the property on March 18, 2014. He confirmed water damage to the acoustic ceiling tile and ceiling installation in the interior storage room, and water stains on the exterior block wall. He was unable to access the roof by using the ladder he had with him at the time, so he returned the following day, March 19, 2014, to meet Willis, the roofer, at the property with a taller ladder. Willis accompanied Evers onto the roof, where Evers observed a loose roofing seam between two pieces of rubber roofing above the interior area that had suffered water damage. He also observed an area of rubber roofing that had "pulled away" from the parapet wall near the loose roofing seam, but there were no visible signs of any loose perimeter roof flashing. Evers also confirmed in his written report that "large amounts of water" had seeped under the rubber roof and "wicked" underneath the entire roof cover.[11]

Willis testified by affidavit that, during his February 25, 2014 inspection, he had observed that the roof seams were "generally intact, were not separated, and the roof was holding water without any significant leakage."[12] At that time, he did not see any seams that needed to be resealed due to separation.[13] However, when Willis re-inspected the roof on March 19, after the weather event, he noticed that some

---

[11] Doc. no. 16-3 (Evers & Associates, Inc. Report), at ECF 2-3.
[12] Doc. no. 18-1, at ECF 17 (Affidavit of Bill Willis).
[13] *Id.*

seams had "come apart," and "had the appearance of having been separated by wind uplift, resulting in water leaking into the building."[14] Willis theorized to Evers that "a strong wind storm has . . . created an 'up draft,' which pulled the rubber roofing up and away from the building," and that the "'up draft' caused the roofing seam to 'pull apart'" *after* the date of Willis's previous inspection. Evers did not express either agreement or disagreement with Willis's theory in his written report. Instead, he opined that "a structural engineer would be helpful to determine whether . . . there was strong enough wind in the area to have caused an 'up draft' to have damaged the roof cover."[15] He did find that there was "a small amount of wind damage to an aluminum awning" on the property.[16] Even so, plaintiff was not aware of any other buildings in the vicinity suffering wind damage from the same storm.[17]

Evers did not ask Willis to provide any photographs depicting the condition of the roof before the storm.[18] He also did not take any notes of his conversation with Willis or request Willis to provide a written statement.[19] After Evers rendered his report on March 24, 2014, Auto-Owners did not ask him to do anything else,

---

[14] *Id.* at ECF 18.

[15] Doc. no. 16-3 (Evers & Associates, Inc. Report), at ECF 2-3 (ellipsis supplied).

[16] Doc. no. 18-1, at ECF 10 (Deposition of Sam Evers, p. 32).

[17] Doc. no. 16-4 (Deposition of Roger Walker), at 36.

[18] Doc. no. 18-1, at ECF 11 (Deposition of Sam Evers, p. 35-36).

[19] *Id.* at ECF 10 (Deposition of Sam Evers, p. 31).

including re-questioning Willis, researching wind conditions at the time of the incident, or determining whether wind could have caused the seams to separate.[20]

Instead, Evers' report was forwarded to James Spinks, Auto-Owners' in-house adjuster, who followed Evers' suggestion to engage a structural engineer.[21] Spinks did not take any additional actions to independently verify any of the information Auto-Owners had received from plaintiff, Willis, or Evers.[22] Spinks testified during his deposition that it is his duty as an insurance adjuster to fully investigate every claim, and that he should not stop investigating once he finds a reason to deny the claim.[23]

Brett T. Burnside, a structural engineer with Donan Engineering Co., Inc., was engaged to inspect the property. He conducted the inspection, accompanied by plaintiff and Willis, on April 3, 2014, and provided a written report on April 8, 2014.[24] Burnside's report provided the following background information:

> Mr. Walker stated that he had a leak along the south side of the building, and was in the process of getting estimates for repair. Shortly after receiving the estimates, a storm went through the neighborhood on February 20, 2014. According to him, the storm cause[d] a piece of the metal awning roof to be removed from the front of the building, and a

---

[20] Doc. no. 18-1, at ECF 12-15 (Deposition of Sam Evers, p. 39-49).
[21] Doc. no. 16-5 (Deposition of James Spinks), at 35, 38, 41.
[22] *Id.* at 40-43.
[23] *Id.* at 60.
[24] *See* doc. no. 16-6 (Donan Engineering Report), at ECF 3.

9

seam on the EPDM roof had separated. He further stated that the separated seam allowed water to enter into the roof causing interior leaks in the warehouse area, which was noticed a few weeks after the storm event. According to him, the storm event caused most of the ceiling tiles in the warehouse area to fall onto the floor. In addition, he pointed out some areas in the office where the roof leaks were recent. He further stated that most of the stains on the ceiling were old and inactive, and that the carpets in the offices were not wet.

Doc. no. 16-6 (Donan Engineering Report), at ECF 4 (alteration supplied).

After studying wind speeds and precipitation data in the Huntsville, Alabama area for February 20, 2014, Burnside discovered maximum wind speeds of 35 miles per hour, maximum gusts of 46 miles per hour, and rainfall values of 2.14 inches.[25] Inside the structure, he observed damage to the metal awning at the front of the building and multiple signs of water damage. On the roof, he observed that no parapet cap flashings were lifted, bent, or torn. In two areas, the roof seams had sufficiently separated that the adjoining pieces of rubber roofing could be pulled apart by hand. Multiple other seams were loose, and puddles of water were visible on the roof. The rubber membrane was tented along the parapet walls and stretched around a roof penetration, where water was arising from a seam.[26] Based on his observations

---

[25] *Id.* at ECF 4.

[26] *Id.* at ECF 4-5. Burnside noted that shrinkage commonly occurs when the oils within the rubber roofing material degrade over time.

> The shrinkage or contraction is most evident at walls, where the resulting tension produced in the EPDM causes an inadequately secured flashing membrane to pull away from parapet walls until the roof and flashing membrane are stretched taut, a

and expertise, Burnside offered three conclusions:

- The metal roof panel missing on the front of the building is consistent with damage caused by wind.

- The separated seam is due to age related deterioration of the seam and the shrinkage of the EPDM membrane.

- The separated EPDM seam is not due to wind.

*Id.* at ECF 7.

Spinks reviewed Burnside's report and spoke to Burnside.[27] He then issued a letter on April 14, 2014, informing plaintiff that no coverage was available under the policy. According to Auto-Owners,

> the policy specifically excludes damage caused by or resulting from wear/tear, deterioration, and shrinkage. As our investigation has revealed that the water leak and damage to your building is caused as a result of these issues we must respectfully deny your claim. Furthermore, for the interior damages to be covered there must first be damage to the building or structure caused by a covered cause of loss to its roof or walls through which the water enters. This is not the case as the cause of the water leak is due to perils which are specifically excluded.

Doc. no. 16-8 (Auto-Owners April 14, 2014 Letter), at ECF 6. Spinks testified during his deposition that if the seam separation had been caused by a wind event, the claim

---

condition sometimes referred to as "tenting." As the tension increases over time, the roof membrane attachment at the base of the parapet walls can tear loose, thus further damaging the roof system.

*Id.* at ECF 6-7.

[27] Doc. no. 16-5 (Deposition of James Spinks), at 42-44.

would have been payable, even if the roof was old and partially deteriorated when the separation occurred.[28] Moreover, even though the damage to the metal awning was deemed to be caused by wind, the estimate to repair that damage was less than plaintiff's $500 deductible, so plaintiff did not receive any payment from Auto-Owners.[29] Auto-Owners informed plaintiff that he should respond to the letter within fourteen days if he had any questions, or if he disagreed with the findings.[30]

Plaintiff did not respond to Auto-Owners within fourteen days. Instead, his attorney sent a reconsideration request to Auto-Owners on August 21, 2015, *more than sixteen **months** later*.[31] Plaintiff asked Auto-Owners to provide evidence of any attempts to review other wind and/or rain events in the time frame of the alleged loss. According to plaintiff, there were several significant weather events in the weeks leading up to the alleged loss, and "since no water damage resulted from these previous instances of significant rain, the roof and seams were intact prior to the event in question."[32] Plaintiff also noted that he had asked "Bill Ellis [*sic:* Willis],"[33] to inspect the roof on February 25, 2014, and provide an estimate for repairing and/or

---

[28] *Id.* at 66-67.

[29] Doc. no. 16-8 (April 14, 2014 Letter), at ECF 7.

[30] *Id.*

[31] Doc. no. 16-9 (August 21, 2015 Letter).

[32] *Id.* at ECF 2-3.

[33] This appears to be a typographical error by plaintiff's attorney. The name of the roofer is consistently listed elsewhere, including in his own affidavit, as Bill *Willis*.

replacing the roof. Plaintiff's attorney included photographs taken by Willis during his inspection, and pointed out that Willis did not identify any leaks or separated seams on February 25. Thus, according to plaintiff, "there was no leak or roof failure until the wind caused the seam separation."[34] Finally, plaintiff pointed out that he had always complied with Auto-Owners' requests for yearly inspections of the property, but that Auto-Owners never raised any concerns about the integrity of the roof, and never asked that any repairs be made.[35]

After receiving plaintiff's request for reconsideration, Spinks reviewed the file, verified the information plaintiff provided about weather events, consulted with his branch manager, and recontacted Brett Burnside, who opined that none of the weather events plaintiff had identified were the cause of the damage.[36] Spinks sent plaintiff another letter on October 6, 2015, stating that Auto-Owners had reviewed the entire file, including the additional photographs plaintiff had recently submitted, but that it was standing by its original decision to deny the claim because it still believed the roof leak was caused by deterioration and shrinkage of the seams, not by wind.[37]

### III. DISCUSSION

---

[34] Doc. no. 16-9 (August 21, 2015 Letter), at ECF 3.
[35] *Id.* at ECF 4.
[36] Doc. no. 16-5 (Deposition of James Spinks), at 55-56.
[37] Doc. no. 16-10 (October 6, 2015 Letter).

Defendant asserts that it is entitled to summary judgment on plaintiff's bad faith cause of action, with regard to the denial of both the roof damage claim and the internal property damage claim. "Alabama law recognizes two forms of bad faith: 'normal' and 'abnormal.' These are not two torts but a single tort 'with different options for proof.'" *Coleman v. Unum Group Corp.*, 207 F. Supp. 3d 1281, 1284 (S.D. Ala. 2016) (quoting *State Farm Fire and Casualty Co. v. Brechbill*, 144 So. 3d 248, 257-58 (Ala. 2013)).

In the present case, plaintiff has conceded his "normal" bad faith claim and is proceeding only with a theory of "abnormal" bad faith.[38] Specifically, plaintiff asserts that defendant "did not fully marshal all of the facts necessary to make a fair determination as to coverage before it refused to pay Plaintiff's claim."[39]

As the Alabama Supreme Court recently re-iterated, the tort of abnormal bad faith has five elements:

> "(a) an insurance contract between the parties and a breach thereof by the defendant;
>
> "(b) an intentional refusal to pay the insured's claim;
>
> "(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);

---

[38] *See* doc. no. 18 (Plaintiff's Brief), at 8 ("Plaintiff also concedes that the usual or 'normal' path to a verdict on his bad faith claim is not open to him in this case. His claim results from the Defendant's 'abnormal' bad faith.").

[39] *Id.*

14

> "(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
>
> "(e) *if the intentional failure to determine the existence of a lawful basis is relied upon*, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim."

*Brechbill*, 144 So. 3d at 257 (quoting *National Security Fire & Casualty Co. v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982)) (emphasis supplied).

> Regardless of whether the claim is a bad-faith refusal to pay [*i.e.,* "normal" bad faith] or a bad-faith refusal to investigate [*i.e.,* "abnormal" bad faith], the tort of bad faith requires proof of the third element, absence of legitimate reason for denial: "Of course, *if a lawful basis for denial actually exists*, the insurer, as a matter of law, cannot be held liable in an action based upon the tort of bad faith." *Gulf Atlantic Life Ins. Co. v. Barnes*, 405 So. 2d 916, 924 (Ala. 1981) (emphasis added). As we held in *Weaver*[*v. Allstate Insurance Co.*], where the "[insurer's] investigation established a legitimate or arguable reason for refusing to pay [the insured]'s claim, [that] is all that is required." 574 So. 2d [771,] 774[ (Ala. 1990)]. *See also Bowers v. State Farm Mut. Auto. Ins. Co.*, 460 So. 2d 1288, 1290 (Ala. 1984) ("[W]here a legitimate dispute exists as to liability, . . . a tort action for bad faith refusal to pay a contractual claim will not lie.").

*Brechbill*, 144 So. 3d at 258 (emphasis and ellipsis in original; first, second, third, seventh, and eighth alterations supplied, other alterations in original). In other words, "[t]he existence of an insurer's lawful basis for denying a claim is a sufficient condition for defeating a claim that relies upon the fifth element of the insurer's intentional or reckless failure to investigate." *Id.* (alteration supplied).

15

Here, Auto-Owners had a legitimate, or at the very least, *arguable* reason for denying plaintiff's claims. While the policy would have provided coverage for roof damage caused by wind, it did not cover roof damage caused by wear and tear, deterioration, or shrinking of the roofing material. Brett Burnside, a structural engineer, examined the property and researched weather conditions, then opined that the separation in the roof seams was caused by deterioration and shrinkage, not by wind. Auto-Owners reasonably relied upon Burnside's opinion to deny the roof damage claim, and it re-contacted Burnside to confirm that opinion before denying plaintiff's request to reconsider the original denial decision. *See Adams v. Auto-Owners Insurance Co.*, 655 So. 2d 969, 971-72 (Ala. 1995) (holding that the insurer had at least an arguable basis for denying the plaintiff's roof damage claim when it relied upon the opinion of a structural engineer that the damage was due to age, not wind). Moreover, as plaintiff himself acknowledges, coverage was only available under the policy for water damage to the inside of the structure if the roof damage was also covered. Because there was an arguable reason for denying the claim for roof damage, there also was an arguable reason for denying the claim for interior water damage.[40]

---

[40] *Id.* at 8 ("The third issue raised by Defendant, bad faith arising from failure to pay for damage to the interior, Plaintiff contends is subsumed and controlled by his abnormal bad faith claim and succeeds or fails with it. Basically the same arguments Plaintiff presents here in opposition to summary judgment apply to the claim for failing to pay for the interior damage.").

Those arguable grounds for denying plaintiff's insurance claim preclude his cause of action for bad faith, even if Auto-Owners' decision to deny the claim was wrong, and even if plaintiff ultimately prevails on his other cause of action, for breach of the insurance contract. As the Alabama Supreme Court has held, "'more than bad judgment or negligence is required in a bad-faith action.'" *Brechbill*, 144 So.3d at 259 (quoting *Singleton v. State Farm Fire & Casualty Co.*, 928 So.2d 280, 287 (Ala. 2005)). The claim also requires proof of "'a dishonest purpose and means a breach of known duty, *i.e.*, good faith and fair dealing, through some motive of self-interest or ill will.'" *Brechbill*, 144 So. 3d at 259-60 (quoting Gulf *Atlantic Life Insurance Co. v. Barnes*, 405 So.2d 916, 924 (Ala. 1981)). There is no such evidence of bad faith in this case.

Plaintiff's contrary arguments and the cases he cites all relate to the fifth element of an abnormal bad faith claim: *i.e.,* the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim. Those arguments are of no consequence because the third element — the absence of any reasonably legitimate or arguable reason for refusing the claim — cannot be satisfied.

## IV. CONCLUSION AND ORDER

In accordance with the foregoing, it is ORDERED that defendant's motion for

partial summary judgment is GRANTED, and plaintiff's bad faith claim is DISMISSED with prejudice. This case will be set by separate order for a pretrial conference and trial on plaintiff's breach of contract claim.

DONE this 25th day of October, 2017.

_____
United States District Judge